**EXHIBIT D**

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. NO. 04-11842-PBS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

SCOTT RODGERS,                                           \*

    Plaintiff                                          \*

vs.                                                      \*

CORRECTION OFFICER ORCHID,                               \*

UNKNOWN CORRECTION OFFICER JOHN                          \*

DOE, JOE WHITMORE, DR. HOWARD,                           \*

JOHN SMITH, PLYMOUTH COUNTY,                             \*

    Defendants                                         \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF JOSEPH A. WHITTEMORE

HRONES, GARRITY & HEDGES

Lewis Wharf Bay, Suite 232

Boston, Massachusetts

June 1, 2006     11:15 a.m.

Maryellen Coughlin

Registered Professional Reporter

Page 22

1  crushed at Plymouth County? How did you know,
2  let's put it that way?
3      MR. BREEN: Objection.
4  A.  We just knew because we were,
5  because that was the policy, to crush psych meds
6  and anything potential to be abused.
7  Q.  But is it written down somewhere?
8  A.  Yes.
9  Q.  Where is that?
10 A.  In the policies.
11 Q.  Which particular policy?
12 A.  Probably the 600 series. It's the
13 medical department's book of policies.
14 Q.  So in that 600 series policy,
15 you're saying there's a list of individual names
16 of medicines that need to be crushed?
17 A.  No, not individual names.
18 Categories of medications.
19 Q.  And so then you based on your
20 training you're saying, determine whether a
21 particular medicine fits in that category?
22     MR. BREEN: Objection.
23 A.  Yes.
24 Q.  Are you familiar with all the

Page 23

1  different medicines that were given out at
2  Plymouth County?
3  A.  Yes.
4  Q.  So you always knew what category a
5  given medicine fit into?
6  A.  Yes. It's your responsibility to
7  know what you're giving them.
8  Q.  And so by that same token, then,
9  you would always know which medicines should be
10 crushed and which shouldn't?
11 A.  Correct.
12 Q.  And this is based solely on that
13 policy, not on conversations with Dr. Howard; is
14 that what you are saying?
15     MR. BREEN: Objection.
16 A.  Yes.
17 Q.  Did he ever tell you, well, we're
18 going to go a little bit beyond the policy and
19 crush some other medicines that aren't on there?
20 A.  No.
21 Q.  Or vice versa, we're not going to
22 crush these even though they should be?
23 A.  No.
24 Q.  Now, let's talk a little bit about

Page 24

1  Naprosyn. Is that the official -- is that a
2  brand name, or is that the official scientific
3  name of the medicine?
4  A.  That's a brand name.
5  Q.  What's the official scientific
6  name?
7  A.  Naproxen sodium.
8  Q.  Can you describe what it's given
9  for?
10     MR. BREEN: Objection.
11 A.  It's a nonsteroidal
12 anti-inflammatory/analgesic/antipyretic.
13 Q.  What does all that mean?
14 A.  It means it reduces fevers, it
15 reduces inflammation, it relieves pain. It's
16 very similar to Advil or Motrin. They're the
17 same class of drug.
18 Q.  What color is it?
19 A.  Depending on the dosage and
20 manufacturer, it could be any color.
21 Q.  What type of category of drug does
22 it fall under?
23 A.  It's a nonsteroidal
24 anti-inflammatory.

Page 25

1  Q.  Does it have any known side
2  effects?
3      MR. BREEN: Objection.
4  A.  Yes.
5  Q.  What are they?
6  A.  G.I. upset, stomach upset. Also,
7  it increases bleeding.
8  Q.  Bleeding where?
9      MR. BREEN: Objection.
10 A.  Anywhere. Bruising. It just makes
11 you more apt to bleed.
12 Q.  Anything else?
13 A.  That's the big one.
14 Q.  What type of conditions is it
15 prescribed to treat?
16     MR. BREEN: Objection.
17 Q.  You can answer.
18 A.  Okay. Pain, rheumatism.
19 Q.  Does that mean arthritis?
20 A.  Yes.
21 Q.  Any other conditions that it's
22 given to treat?
23     MR. BREEN: Objection.
24 A.  No. It's a pain reliever.

### Page 26

1  Headaches. I mean, you could take it for that.
2  Just general malaise, pain, inflammation.
3      Q.   Now, during the period of August
4  2001, Scott Rodgers was prescribed Naprosyn
5  during that time period, right?
6      A.   Yes.
7      Q.   How long was he on it?
8      A.   I don't know.
9      Q.   Is there something that would
10 refresh your memory as to when he was put on it?
11     A.   Possibly.
12     Q.   Can we mark this, please.
13         (Exhibit No. 1 was marked
14          for identification.)
15     Q.   Just take a look at this document
16 here. Specifically we'll start with the first
17 page, but you can take a look at the whole thing,
18 if you want.
19         MR. BREEN: Do you want him to read
20 the whole thing?
21         MR. TUMPOSKY: At some point, yeah.
22 If you want to do it now or as I go through it,
23 it's up to you.
24         MR. BREEN: Okay. Read the whole

### Page 27

1  thing. Take your time.
2          MR. TUMPOSKY: Why don't we just
3  separate out actually the first page and start
4  with that, and we'll call the first page an
5  exhibit by itself.
6          MR. BREEN: That's fine with me.
7          MR. TUMPOSKY: Okay. And the rest
8  of it we'll mark as a separate exhibit.
9          MR. BREEN: Exhibit 1 would be one
10 page, then?
11         MR. TUMPOSKY: Yes.
12         Is that your handwriting?
13     A.   No.
14     Q.   What is this document that we are
15 marking as Exhibit 1?
16         MR. BREEN: If you know.
17     Q.   If you know.
18     A.   It's a doctor's order sheet.
19     Q.   So that would imply that it was
20 Dr. Howard who wrote this?
21         MR. BREEN: Objection.
22     Q.   Can you tell by looking at the
23 writing on the document who wrote it?
24     A.   Yeah, Dr. Howard. Dr. Howard.

### Page 28

1      Q.   How can you tell?
2      A.   I know his writing, and he signed
3  it here (indicating).
4      Q.   Where?
5      A.   Right there (indicating).
6          MR. BREEN: Let me state that the
7  original document doesn't have an orange line
8  through it on a particular entry.
9          MR. TUMPOSKY: Sure.
10     A.   And he signed it here (indicating),
11 I believe, as well.
12     Q.   'Cause no one else would be, other
13 than a doctor would write a physician's order out
14 I would assume, right?
15         MR. BREEN: Objection.
16     A.   At the time he had a physician's
17 assistant who would write orders who was also --
18     Q.   Who?
19     A.   Steve McCabe I think was the PA at
20 the time. It was either Steve McCabe who was the
21 PA or Donna Feeney who was the nurse
22 practitioner, but they could write orders. Also,
23 our psychiatrist could write orders, and the
24 orthopedic PA would write orders.

### Page 29

1      Q.   But you couldn't, right?
2      A.   No, I couldn't, no.
3      Q.   Can you read the writing on this
4  document?
5      A.   Most of it, yeah.
6      Q.   Can you tell me in your own words
7  what it says?
8      A.   He's ordered Celexa 20 milligrams
9  once a day for 30 days. He's ordered us to get
10 the old records at Neponset Health Center in
11 Dorchester and Dorchester House of Correction.
12 He's ordered a bottom bunk. He's ordered
13 Naprosyn 500 milligrams twice a day. Old records
14 from Mass. General Hospital. He's given
15 permission for him to have a knee support. And
16 he's written Clonidine 0.1 milligrams twice a day
17 for three days.
18     Q.   Now, right below where it says
19 Naprosyn 500 milligrams PD, what's the next line?
20     A.   It's BID times 30 days.
21     Q.   So what does that mean?
22     A.   It means by mouth twice a day for
23 30 days.
24     Q.   And this is dated August 7th, 2001?

### Page 30

1  A.  Yes.
2  Q.  How long after a physician's order
3  is given does it go into effect?
4  A.  Immediately as soon as it's taken
5  off, as soon as it's been transcribed to the
6  medication sheet.
7  Q.  How long does that take?
8  A.  It depends on the day. I mean, you
9  know, best case scenario within a couple of
10 hours, but sometimes they would -- it might take
11 a day.
12 Q.  But at the most a day?
13 A.  Generally, yeah.
14 Q.  And the next day you started giving
15 Naprosyn to Scott Rodgers, right?
16     MR. BREEN: Objection.
17 A.  Not necessarily. It would also
18 have to be sent from the pharmacy, so that also
19 might take a day.
20 Q.  So a couple of days after this,
21 then, you started giving Naprosyn to Scott
22 Rodgers, at the latest?
23     MR. BREEN: Objection. Just for
24 clarification when you say "you," you mean

### Page 31

1  Mr. Whittemore.
2      MR. TUMPOSKY: I'm sorry, I mean
3  Mr. Whittemore, yes.
4  A.  I don't know.
5  Q.  But you did give Scott Rodgers
6  Naprosyn at some point during August 2001?
7      MR. BREEN: Same objection.
8  Q.  You, Mr. Whittemore. You singular.
9  A.  Yes.
10 Q.  What color was it?
11 A.  If I remember correctly, pink.
12 Q.  What brand is that?
13 A.  It's just naproxen sodium, and it
14 was issued to us by PharMerica.
15 Q.  How was it given to him?
16 A.  In a cup, by mouth.
17 Q.  Did you watch him take it?
18 A.  Yes.
19 Q.  How many milligrams?
20 A.  Five hundred milligrams.
21 Q.  Is it time released?
22 A.  No.
23 Q.  How can you tell?
24 A.  'Cause it would say that. We've

### Page 32

1  never used time released or buffered Naprosyn.
2  I'm not even sure if there is such a thing.
3  Q.  It would say if it was time
4  released?
5  A.  Yes.
6  Q.  Where would it say?
7  A.  It would say on the medication
8  card. It would say something like Naproxen ER
9  or, you know, extended release. It would have
10 some sort of, some sort of -- the word I'm
11 looking for is -- it would say, and it didn't.
12 It doesn't. We don't use anything in any
13 Naprosyn that's an extended release.
14 Q.  Why not?
15     MR. BREEN: Objection.
16 A.  Like I said, I'm not even sure if
17 there is an extended release version. It's
18 probably more probable that if anything there
19 would be maybe a buffered version, but it's not,
20 it's not widely used, if at all, even if there is
21 a buffered version.
22 Q.  What's the difference between
23 buffered and extended release?
24 A.  Extended release is usually coated.

### Page 33

1  I'm just speaking extended release medications,
2  not specifically Naprosyn, because I don't know
3  even if they do make them, but usually it's
4  coated and so it dissolves slower and it releases
5  the medication slower.
6  Q.  If a buffered medicine were
7  crushed, would that affect the way it was
8  distributed to a person inside their body?
9      MR. BREEN: Objection.
10 A.  Not necessarily buffered, but the
11 time release, yes, that would affect it.
12 Q.  But buffered you're saying it
13 wouldn't matter?
14 A.  It could. It might. I really
15 don't know.
16 Q.  Did you crush the Naprosyn?
17 A.  No.
18 Q.  You specifically remember not
19 crushing it?
20 A.  We never needed to. It was never a
21 drug to be crushed. It wasn't a psych med, and
22 there was no real potential for abuse with it.
23 Q.  What other medicines was Scott
24 Rodgers taking at that time?