JOSEPH WHITTEMORE
June 1, 2006

Page 38

1  Q. Well, he was prescribed Naprosyn
2  for 30 days, right?
3  A. Right.
4  Q. And it was discontinued when he
5  went to the hospital, right?
6  A. Yes.
7  Q. Nineteen days later, approximately?
8  A. Yeah.
9  Q. So what would you do with the rest
10 of the medicine that was left on his card?
11 A. It would have been sent back to the
12 pharmacy or destroyed. We wouldn't have kept it.
13 Q. Do you recall your first encounter
14 with Scott Rodgers?
15 A. No.
16 Q. When did he first complain to you
17 about his stomach?
18 A. I don't remember it very well, but
19 apparently it was that day on morning med rounds.
20 Q. What happened?
21 A. To the best of my recollection, he
22 said that he had a stomach ache, and he wanted
23 Maalox or Mylanta, which I gave him, and then
24 later that day he was sent down to the medical

Page 39

1  department with stomach cramps and nausea and
2  vomiting. I assessed him and sent him to the
3  hospital.
4  Q. Is there something in there that
5  was relevant to that last question? Is there
6  some note in there about your meeting with him
7  that you were reading?
8        MR. BREEN: Objection.
9  Q. I'm just making sure this is from
10 your memory or is it from --
11 A. No, it's from my memory. There is
12 nothing in here.
13 Q. Was that the only time that he
14 complained to you?
15       MR. BREEN: Objection.
16 A. As far as I know, yeah. I believe
17 that was the first time, and then it was that day
18 that he went to the hospital.
19 Q. You're saying he asked for Mylanta
20 or Maalox?
21 A. Yeah.
22 Q. You didn't have a discussion with
23 him two days before that?
24       MR. BREEN: Objection.

Page 40

1  A. No, I don't recall.
2  Q. Do you recall anything else about
3  the discussion other than what you've said, the
4  day of the incident?
5  A. No.
6  Q. How did he get into the medical
7  area?
8  A. He had complained to the officer on
9  the unit that he was throwing up, wasn't feeling
10 well, so he had him come down to medical.
11 Q. Does he come by himself, or does he
12 have to be escorted?
13 A. No, he can come by himself.
14 Q. Who did he complain to, what
15 officer?
16 A. I don't know.
17 Q. Was there any particular officer
18 that he had complained to, or just whoever was
19 nearby?
20 A. There was probably two officers in
21 the unit, and you know, I don't recall which
22 officer called me.
23 Q. Would that be logged anywhere?
24 A. It may be. It should be.

Page 41

1  Q. Where would that be logged?
2  A. Probably in the logbooks for the
3  unit. The COs have to fill out logbooks, people
4  coming and going, you know, inmates, in the unit,
5  movement.
6  Q. These logbooks are kept --
7  A. I would imagine --
8  Q. -- every day?
9  A. Yes, yes.
10 Q. What did that officer tell you when
11 he called?
12       MR. BREEN: Objection. Go ahead.
13 A. I don't recall specifically, but he
14 must have said, you know, Scott Rodgers isn't
15 feeling well. He's throwing up. Can he be seen?
16 Something along those lines I'm sure. I don't
17 recall specifically. I just remember he came
18 down.
19 Q. What did you do when Scott Rodgers
20 complained to you of these symptoms other than
21 giving him Maalox?
22 A. At the time, nothing. I gave him
23 his Maalox, gave him his meds. I'm not sure if I
24 gave him the Naprosyn that morning or not, but

11 (Pages 38 to 41)

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

### Page 54

1  A.  That he vomited, and the vomit was
2  brown, maroon in color.
3  Q.  What does that -- to you what did
4  that signify?
5  A.  That he possibly had a G.I. bleed.
6  Q.  But you don't remember him saying
7  anything else?
8  A.  No. Who?
9  Q.  Officer Murray, I'm sorry.
10  A.  No.
11  Q.  Prior to that, prior to this day,
12  did Rodgers send out any sick call requests?
13  A.  I don't know.
14  Q.  Are sick call requests maintained
15  by the county?
16  A.  For a little while.
17  Q.  How long?
18  A.  I'm not sure.
19  Q.  Had you spoken to him prior to that
20  day?
21  MR. BREEN: Objection.
22  A.  I really don't remember. After
23  this day, I remember him. I didn't really know
24  him.

### Page 55

1  Q.  Were there any discussions with
2  Dr. Howard or John Smith about Scott Rodgers?
3  A.  Before this, I don't remember. I
4  don't think so.
5  Q.  What about his prior medical
6  history, did you know that?
7  A.  I didn't know much of it, no.
8  Q.  Did he have an ulcer prior to
9  coming to Plymouth County?
10  A.  I don't know if he did or he
11  didn't. It might say that in here. I didn't
12  know. He may have.
13  Q.  Would someone's prior medical
14  condition be something you would discuss with the
15  doctor?
16  A.  On occasion.
17  Q.  What would it depend on?
18  A.  If it was significant for -- well,
19  if something happened or if it was, you know, a
20  point of interest or, you know, kind of a
21  learning situation, Dr. Howard wanted us to know
22  about something. Certainly it was too hard to
23  discuss everybody's past medical history 'cause
24  there's just so many people there.

### Page 56

1  Q.  Would you discuss contraindications
2  with other medicines? I'm sorry, strike that,
3  please.
4  Would you discuss allergies to
5  medication?
6  MR. BREEN: Objection.
7  A.  We wouldn't discuss them. I mean,
8  either they have the allergy or not. It would be
9  noted on the med sheet and in his chart.
10  Q.  What are NSAIDs?
11  A.  Nonsteroidal anti-inflammatories.
12  Q.  Is that what Naprosyn is?
13  A.  Yes.
14  Q.  So if someone is allergic to that,
15  what --
16  A.  We wouldn't give them that, and we
17  wouldn't give them aspirin, and we wouldn't give
18  them Advil or -- there's quite a few.
19  Q.  What would happen if you did give
20  someone Naprosyn who was allergic to nonsteroidal
21  anti-inflammatories?
22  MR. BREEN: Objection.
23  A.  It would depend on the nature of
24  their allergy, I mean.

### Page 57

1  Q.  If it was severe?
2  MR. BREEN: Objection.
3  A.  Well, not just the severity but the
4  type of allergic reaction. If it was anaphylaxis
5  or if it was just, you know --
6  Q.  What does that mean?
7  A.  With severe anaphylaxis, your
8  throat will close up. You know, breathing,
9  respiratory distress, that sort of thing. Like,
10  you know, some people get stung by bees and get
11  anaphylaxis. Some medications will affect you
12  that way. It depends on what kind of reaction it
13  was known that he had, you know.
14  Q.  Would that be something that would
15  tend to exacerbate the side effects of a certain
16  medicine?
17  MR. BREEN: Objection.
18  A.  I don't know if I'm qualified to
19  answer that. Ask it again.
20  Q.  Okay. I'll put it a little bit
21  differently. Would that exacerbate the potential
22  side effects of Naprosyn, if someone was allergic
23  to nonsteroidal anti-inflammatories?
24  MR. BREEN: Objection.

Page 78

1     MR. BREEN: Objection.
2     A.    Anywhere between probably four to
3  seven days a week.
4     Q.    How many hours per day?
5     A.    I don't know.
6     Q.    Approximately?
7     A.    If I had to guess --
8     MR. BREEN: Just tell him what you
9  know.
10    A.    I don't know.
11    Q.    What about in 2001, how many days a
12 week was he there?
13    A.    I don't know. Most every day.
14    Q.    You're an employee of Plymouth
15 County, right?
16    A.    Correct.
17    Q.    Do you have any type of employment
18 contract or --
19    A.    No.
20    Q.    You're just a standard employee?
21    A.    (Witness nods.)
22    Q.    Right?
23    A.    Right.
24    Q.    What about Dr. Howard?

Page 79

1     A.    He's a contractor.
2     Q.    Does he work for a company or does
3  he work on his own?
4     A.    He works on his own.
5     Q.    Do you know the nature of the
6  relationship, contractual relationship at all?
7     A.    No.
8     Q.    Do you know where he went to
9  medical school?
10    A.    Yale.
11    Q.    College?
12    A.    Yale, I think.
13    Q.    How old is he?
14    A.    I don't know. 60, 65.
15    Q.    Have you had any discussions with
16 him at any time about Scott Rodgers?
17    A.    Yes.
18    Q.    When?
19    A.    After he was sent out.
20    Q.    Can you describe that conversation?
21    A.    I don't really recall the
22 conversation.
23    Q.    Do you remember any part of it?
24    A.    No. Just that we touched base, you

Page 80

1  know, that he was in the hospital or that he was
2  coming back or whatever and he's okay.
3     Q.    Do you remember anything else about
4  the conversation?
5     A.    No.
6     Q.    Was that the only time that you
7  talked about Scott Rodgers?
8     A.    We talked about it a little bit
9  just recently, just the fact that we were both
10 being deposed.
11    Q.    What was said in that conversation?
12    A.    I said -- nothing specifically
13 other than I had to come here on Thursday and the
14 time and are you coming as well.
15    Q.    And what did he say?
16    A.    He said he wasn't sure.
17    Q.    But he received the notice of
18 deposition --
19    MR. BREEN: Objection.
20    Q.    -- according to what he said to
21 you?
22    A.    He knew about the deposition, that
23 I was being deposed at least.
24    Q.    Did he say anything about why he

Page 81

1  doesn't have a lawyer?
2     MR. BREEN: Objection.
3     A.    No.
4     Q.    Did you talk about anything else
5  other than the fact that you both had to come
6  here this afternoon?
7     A.    No.
8     Q.    How did he seem to you when you
9  discussed it? What were your observations of his
10 demeanor?
11    A.    Just like he always is. He didn't
12 seem particularly --
13    Q.    How is he always?
14    A.    He's a nice guy. He's funny. He's
15 personable. He didn't seem flustered or worried.
16    Q.    But you've never talked about
17 depositions with him prior to this?
18    A.    No.
19    Q.    So you don't know if he's ever been
20 deposed before?
21    A.    I have no idea.
22    Q.    Okay. I think that's it.
23    MR. BREEN: Just give me a minute.
24    (Discussion off the record.)

Page 82

```
 1            EXAMINATION
 2   BY MR. SULLIVAN:
 3       Q.   I want to just make sure I
 4   understand. The medical log, is that the same
 5   thing as the medical administration book?
 6       A.   Yeah.
 7       Q.   Okay. And then the intake form
 8   would be the initial intake?
 9       A.   (Witness nods.)
10       Q.   And then the third thing would be
11   the physical examination form?
12       A.   Yes.
13       Q.   It's just those three things?
14       A.   Yes.
15       Q.   Okay. I just wanted clarification
16   on those three. Thank you.
17
18            EXAMINATION
19   BY MR. BREEN:
20       Q.   Mr. Whittemore, you were asked by
21   Attorney Tumposky whether you had spoken about
22   Scott Rodgers at all with Dr. Howard. Do you
23   recall that question being asked of you?
24       A.   Yes.
```

Page 83

```
 1       Q.   And you testified that there was
 2   some point in time after Mr. Rodgers had been
 3   sent to the hospital that you touched base with
 4   Dr. Howard, and you learned he would be returning
 5   to the facility, correct?
 6       A.   Yes.
 7       Q.   And you mentioned that you had had
 8   a brief discussion recently with Dr. Howard about
 9   the fact that you would be appearing for a
10   deposition here today, correct?
11       A.   Yes.
12       Q.   And you've recounted everything you
13   remember about that discussion, correct?
14       A.   Yes.
15       Q.   Did you also contact Dr. Howard at
16   or around the time that Mr. Rodgers reported to
17   the medical facility or the medical area before
18   you sent him to Jordan Hospital?
19       A.   Yes, right about at the same time.
20       Q.   Tell me about that conversation.
21   What did you do?
22       A.   When we're going to send somebody
23   out, we notify the shift commander, we notify the
24   hospital that the patient is coming, and we call
```

Page 84

```
 1   the doctor to get an official order that he's
 2   being sent out, just so the doctor is aware of
 3   it.
 4       Q.   And you made Dr. Howard aware at or
 5   around the time that you sent out Mr. Rodgers
 6   that you were going to do so or had done so,
 7   correct?
 8       A.   Yes.
 9       Q.   That's all the questions I have.
10            Are you all set?
11            MR. TUMPOSKY: I want a little
12   clarification on that last conversation.
13
14            FURTHER EXAMINATION
15   BY MR. TUMPOSKY:
16       Q.   How long before you called the
17   ambulance or how long -- relative to the time
18   that you called the ambulance, when did that
19   conversation occur?
20       A.   Probably within five minutes.
21       Q.   Before or after?
22       A.   It was probably after. I
23   probably -- I put in motion to send him out, and
24   then I called Dr. Howard.
```

Page 85

```
 1       Q.   Did you describe the symptoms to
 2   him?
 3       A.   I'm sure I did, yes.
 4       Q.   What did he say to you?
 5       A.   Okay.
 6       Q.   Just that, that's it?
 7       A.   Yeah.
 8       Q.   Okay.
 9            MR. BREEN: Nothing further.
10   Thanks.
11            MR. SULLIVAN: Nothing further.
12            (Deposition concluded at 1:16 p.m.)
```

22 (Pages 82 to 85)

Page 86

1  CERTIFICATE
2  I, Maryellen Coughlin, a Registered
3  Professional Reporter and Notary Public of the
4  State of Massachusetts, do hereby certify that
5  the foregoing is a true and accurate transcript
6  of my stenographic notes of the deposition of
7  JOSEPH A. WHITTEMORE. Who appeared before me,
8  satisfactorily identified themself, and was by
9  me duly sworn, taken at the place and on the
10 date hereinbefore set forth.
11      I further certify that I am neither
12 attorney nor counsel for, nor related to or
13 employed by any of the parties to the action in
14 which this deposition was taken, and further
15 that I am not a relative or employee of any
16 attorney or counsel employed in this case, nor
17 am I financially interested in this action.
18      THE FOREGOING CERTIFICATION OF THIS
19 TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF
20 THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
21 CONTROL AND/OR DIRECTION OF THE CERTIFYING
22 REPORTER.
23
24      MARYELLEN COUGHLIN, RPR

Page 87

1      UNITED STATES DISTRICT COURT
2         DISTRICT OF MASSACHUSETTS
3            C.A. NO. 04-11842-PBS
4
5  *********************
6  SCOTT RODGERS,              *
7       Plaintiff              *
8  vs.                         *
9  CORRECTION OFFICER ORCHID,  *
10 UNKNOWN CORRECTION OFFICER JOHN *
11 DOE, JOE WHITMORE, DR. HOWARD, *
12 JOHN SMITH, PLYMOUTH COUNTY, *
13     Defendants              *
14 *********************
15
16      I, JOSEPH A. WHITTEMORE, do hereby
17 certify, under the pains and penalties of
18 perjury, that the foregoing testimony is true
19 and accurate, to the best of my knowledge and
20 belief.
21      WITNESS MY HAND THIS ____ day of
22 _____, 2006.
23      _____
24         JOSEPH A. WHITTEMORE

Page 88

1              CORRECTION SHEET
2  DEPONENT: JOSEPH A. WHITTEMORE
3  CASE: SCOTT RODGERS VS. CORRECTION OFFICER
4         ORCHID, ET AL
5  DATE TAKEN: 6/1/06
6  ****************************************
7  PAGE / LINE / CHANGE OR CORRECTION AND REASON
8     /     /
9     /     /
10    /     /
11    /     /
12    /     /
13    /     /
14    /     /
15    /     /
16    /     /
17    /     /
18    /     /
19    /     /
20    /     /
21    /     /
22    /     /
23    /     /
24    /     /

Page 89

1  Today's Date:    July 31, 2006
2  To:              William P. Breen, Jr., Esq.
3  Copied to:       Michael Tumposky, Esq.
4                   Robert F. Sullivan, Esq.
5  From:            Maryellen Coughlin, RPR
6  Deposition of:   Joseph A. Whittemore
7  Taken:           June 1, 2006
8  Action:          Scott Rodgers vs. Correction
9                   Officer Orchid, et al
10 ==========================================
11      Enclosed is a copy of Mr. Whittemore's
12 deposition. Pursuant to the Rules of Civil
13 Procedure, Mr. Whittemore has thirty days to
14 sign the deposition from today's date.
15      Please have Mr. Whittemore sign the
16 enclosed signature page. If there are any
17 errors, please have him mark the page, line, and
18 error on the enclosed correction sheet. He
19 should not mark the transcript itself. This
20 addendum should be forwarded to all interested
21 parties.
22      Thank you for your cooperation in this
23 matter.
24